United States District Court Case No. 3:15-cv-01792-MO
United States Bankruptcy Court Case No. 14-34642-tmb11

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
_____

In re FAGERDALA USA – LOMPOC, INC., Debtor
_____

PACIFIC WESTERN BANK and COASTLINE RE HOLDINGS CORP.,
Appellants,

v.

FAGERDALA USA – LOMPOC, INC., Appellee
_____

Appeal from the Order Granting Motion to Designate Votes, Entered on
September 9, 2015, and the Order Confirming Fourth Amended Plan of
Reorganization, Entered on September 14, 2015, in the
United States Bankruptcy Court for the District of Oregon
Honorable Trish M. Brown
United States Bankruptcy Judge

_____

APPELLANTS' OPENING BRIEF
_____

Teresa H. Pearson, OSB No. 953750
teresa.pearson@millernash.com
David W. Hercher, OSB No. 812639
david.hercher@millernash.com
Miller Nash Graham & Dunn LLP
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
(503) 224-5858

David K. Eldan, admitted *Pro Hac Vice*
deldan@pmcos.com
Parker, Milliken, Clark, O'Hara &
Samuelian
555 S. Flower Street
Los Angeles, California 90071-2440
(213) 683-6500

Attorneys for Appellants Pacific Western Bank and Coastline RE Holdings Corp.

**CORPORATE DISCLOSURE STATEMENT**

In accordance with Fed. R. Bankr. P. 8012(a), appellants, Pacific

Western Bank and Coastline RE Holdings Corp., make the following disclosures:

1.    Coastline RE Holdings Corp. is wholly owned by Pacific

      Western Bank.

2.    Pacific Western Bank is wholly owned by PacWest Bancorp.

3.    PacWest Bancorp is a publicly-held company

70068416.2

# TABLE OF CONTENTS

I.   STATEMENT OF BASIS FOR SUBJECT MATTER AND
     APPELLATE JURISDICTION........................................................1

     A.   Bankruptcy Court Jurisdiction ...........................................1

     B.   District Court Jurisdiction .................................................1

     C.   Timeliness of the Appeal....................................................1

     D.   The Orders Appealed are Final ..........................................2

     E.   The Appeal is Not Equitably Moot .....................................2

II.  ISSUES PRESENTED AND APPLICABLE STANDARD OF
     REVIEW ..................................................................................5

III. STATEMENT OF THE CASE .................................................9

     A.   Debtor-Appellee's Bankruptcy Filing and Initial Plans of
          Reorganization.................................................................9

     B.   Lender-Appellants' Purchase of General Unsecured Claims ............10

     C.   Debtor-Appellee's Second Amended Plan and Balloting.................12

     D.   Debtor-Appellee's Motion to Designate and the Initial Hearing
          on Plan Confirmation ........................................................13

     E.   Debtor-Appellee's Third Amended Plan ..............................14

     F.   The Continued Confirmation Hearing .................................14

     G.   The Bankruptcy Court's Ruling .........................................17

     H.   Entry of the Final Orders...................................................21

IV.  SUMMARY OF THE ARGUMENT ........................................21

V.   ARGUMENT...........................................................................22

     A.   The Bankruptcy Court Erred When it Permitted Debtor-
          Appellee to Gerrymander and Reclassify the Unsecured Claims
          Purchased by Lender-Appellants ......................................22

          1.   Substantially similar claims must be classified together ........22

          2.   Claims cannot be gerrymandered into different classes
               just to obtain consent to a chapter 11 plan.............................24

3.   The authority cited by Debtor-Appellee did not support reclassification and gerrymandering ........................................ 25

B.   The Bankruptcy Court Erred in Designating and Disqualifying Lender-Appellants Votes Against the Plan ........................................ 27

1.   The legal parameters for determining good faith .................... 28

2.   The Bankruptcy Court's decision was induced by an erroneous view of the law ........................................ 29

3.   There is no legal requirement that Lender-Appellants offer to purchase all of the claims ............................................ 30

4.   There is no legal requirement that a creditor purchasing claims act to avoid harm to other creditors ............................. 33

5.   The record contains no evidentiary support to justify a finding that Lender-Appellants did not act in good faith ........ 34

a.   Lender-Appellants were not competitors seeking an unfair advantage over the Debtor-Appellee's business .......................................................... 34

b.   Lender-Appellants were not a proponent of an alternate plan ................................................ 35

c.   Lender-Appellants were not seeking to harm other creditors ........................................ 35

d.   There was no legal or factual basis for the Bankruptcy Court to conclude that if the plan were not confirmed, the unsecured creditors would be unfairly prejudiced ........................................ 36

VI.   CONCLUSION ............................................................ 38

**Cases**

*255 Park Plaza Assocs. Ltd. P'ship v. v. Connecticut Gen. Life Ins. Co.*
   *(In re 255 Park Plaza Associates Ltd. P'Ship)*,
   100 F.3d 1214 (6th Cir. 1996) ............................................................31

*Anderson v. City of Bessemer City, North Carolina*,
   470 U.S. 564, 105 S.Ct. 1504 (1985)...................................................7

*Barakat v. Life Ins. Co. of Va. (In re Barakat)*,
   99 F.3d 1520 (9th Cir. 1996) ...........................................6, 23, 25, 26

*Bullard v. Blue Hills Bank*,
   ___ U.S. ___, 135 S.Ct. 1686 (2015)..................................................37

*Century Glove, Inc. v. First Am. Bank of New York*,
   860 F.2d 94 (3d Cir. 1988) ...................................................................2

*CW Capital Asset Mgmt., LLC v. Burcam Capital II, LLC*,
   2014 WL 2864678 (E.D.N.C. June 24, 2014)
   ....................................................................................................25, 26, 27

*Dish Network Corp v. DBSD North Am., Inc. (In re DBSD North Am., Inc.)*,
   634 F.3d 79 (2d Cir. 2011) ...................................................................2

*Drummond v. Welsh (In re Welsh)*,
   711 F.3d 1120 (9th Cir. 2013) ..............................................................8

*Figter Ltd. v. Teachers Ins. & Annuity Assoc. of Am. (In re Figter Ltd.)*,
   118 F.3d 635 (9th Cir. 1997) ........................ 8, 15, 27, 28, 29, 30, 31, 32, 33, 34

*Goeb v. Heid (In re Goeb)*,
   675 F.2d 1386 (9th Cir. 1982) ..............................................8, 29, 30

*Grasslawn Lodging, LLC v. Transwest Resort Props. Inc.*
   *(In re Transwest Resort Props., Inc.)*,
   801 F.3d 1161 (9th Cir. 2015) .........................................................3, 4

*Hedlund v. Educ. Res. Inst. Inc.*,
   718 F.3d 848 (9th Cir. 2013) ...........................................9, 27, 28, 30

*In re Loop 76, LLC*,
  465 B.R. 525 (9th Cir. B.A.P. 2012) ............................................................25, 26

*In re Marin Town Center*,
  142 B.R. 374 (Bankr. N.D. Cal. 1992) ................................................................32

*Meyer v. Lepe (In re Lepe)*,
  470 B.R. 851 (9th Cir. B.A.P. 2012) ....................................................................8

*In re Monticello Realty Investments, LLC*,
  526 B.R. 902 (Bankr. M.D. Fla. 2015) ................................................................33

*Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii)*,
  761 F.2d 1374 (9th Cir. 1985) ..............................................................................2

*In re Pleasant Hill Partners, L.P.*,
  163 B.R. 388 (Bankr. N.D. Ga. 1994) ....................................................31, 36, 37

*Principal Mut. Life Ins. Co. v. Lakeside Assocs. (In re DeLuca)*,
  194 B.R. 797 (Bankr. E.D. Va. 1996).................................................................31

*Slottow v. American Cas. Co. of Reading, Pennsylvania*,
  10 F.3d 1355 (9th Cir. 1993) ................................................................................7

*Steelcase Inc. v. Johnston (In re Johnston)*,
  21 F.3d 3232 (9th Cir. 1994) ..............................................................................23

*Wall Street Plaza, LLC v. JSJF Corp. (In re JSJF Corp.)*,
  344 B.R. 94 (9th Cir. B.A.P. 2006), *aff'd* 277 Fed. Appx. 718
  (9th Cir. 2008)..............................................................................................7, 29

**Statutes**

11 U.S.C. § 363(c)(2)(A) ....................................................................................4

11 U.S.C. § 507(a)(8)........................................................................................12

11 U.S.C. § 1126 ................................................................................................1

11 U.S.C. §1126(c) ............................................................................................9

11 U.S.C. § 1129................................................................................................1

11 U.S.C. § 1129(a)(10) ........................................................................9

11 U.S.C. § 1129(b)(2)(A) .....................................................................24

28 U.S.C. §157(a) ...................................................................................1

28 U.S.C. § 157(b)(2) .............................................................................1

28 U.S.C. § 158(a)(1) .............................................................................1

28 U.S.C. § 1334 ....................................................................................1

**Other Authorities**

Fed. R. Bankr. P. 8002(a) .......................................................................1

# I. STATEMENT OF BASIS FOR SUBJECT MATTER AND APPELLATE JURISDICTION

## A. Bankruptcy Court Jurisdiction.

The Bankruptcy Court for the District of Oregon (the "Bankruptcy Court") had jurisdiction over this matter pursuant to 28 U.S.C. §§157(a) and 1334. The matters in controversy arose under 11 U.S.C. §§ 1126 and 1129 and are core proceedings as defined in 28 U.S.C. § 157(b)(2).

## B. District Court Jurisdiction.

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1).

## C. Timeliness of the Appeal.

The Bankruptcy Court entered its Order Granting Motion to Designate Votes (the "Designation Order") on September 9, 2015, and it entered its Order Confirming Fourth Amended Plan of Reorganization (the "Confirmation Order"), on September 14, 2015. Excerpt, pp. 498-536. Pacific Western Bank and Coastline RE Holdings Corp. ("Lender-Appellants") filed their Notice of Appeal on September 22, 2015, which was within 14 days of the date of entry of the Designation Order and the Confirmation Order, as required by Fed. R. Bankr. P. 8002(a). Excerpt, pp. 537-80.

70068416.2

**D. The Orders Appealed Are Final.**

The Confirmation Order is a final order. An order confirming a chapter 11 plan is a final appealable order. *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii)*, 761 F.2d 1374, 1378 (9th Cir. 1985).

The Designation Order is a final appealable order because voting has occurred and the bankruptcy plan filed by Fagerdala USA - Lompoc, Inc. ("Debtor-Appellee") was confirmed in the Confirmation Order based on the holding in the Designation Order. *Compare Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, 99 (3d Cir. 1988) (holding order of designation not reviewable prior to classification and voting by creditors) *with Dish Network Corp v. DBSD North Am., Inc. (In re DBSD North Am., Inc.)*, 634 F.3d 79, 101-06 (2d Cir. 2011) (reviewing order designating votes after plan confirmed by bankruptcy court); Excerpt, p. 477.

**E. The Appeal is Not Equitably Moot.**

The Ninth Circuit Court of Appeals applies the following test to determine whether an appeal is equitably moot:

> We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court.

70068416.2

*JPMCC 2007-1 Grasslawn Lodging, LLC v. Transwest Resort Props. Inc. (In re Transwest Resort Props., Inc.)*, 801 F.3d 1161, 1167-68 (9th Cir. 2015), *quoting Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 677 F.3d 869, 881 (9th Cir. 2012). This appeal is not equitably moot because Lender-Appellants have diligently pursued their rights, and this Court can fashion effective and equitable relief without effect on third parties.

The first factor, whether the appellant sought a stay pending appeal, is particularly important. An appellant's diligence in seeking a stay "cuts strongly in favor of appellate review" of an appellant's claims. *Transwest*, 801 F.3d at 1168. After filing the notice of appeal in this case, Lender-Appellants promptly filed their motion for stay pending appeal with the Bankruptcy Court. Excerpt, pp. 581-95. The Bankruptcy Court denied that motion. Excerpt, pp. 596-97, 611-12. Lender-Appellants then promptly filed a motion for stay pending appeal with this Court. Excerpt, pp. 598-610. That motion was also denied. Excerpt, pp. 620.

With respect to the second factor, Lender-Appellants acknowledge that the plan has been substantially consummated. However, this single factor is not dispositive, and the Court must consider the other factors. *Transwest*, 801 F.3d at 1168.

Consideration of this appeal will not "unduly bear on innocent third parties." *Transwest,* 801 F.3d at 1169. To start with, there are not very many third

parties involved in this case.  As set forth in more detail in the factual section below, Lender-Appellants bought and currently own most of the unsecured claims. Lender-Appellants attempted to buy another six claims, collectively totaling the *de minimis* amount of $1,398.07, from other creditors who either did not respond or refused to sell their claims.  Beyond that, there were only three other third-party creditors (a collection agency called The Credit Bureau of San Luis Obispo and Santa Barbara Counties (the "Credit Bureau"), the California Franchise Tax Board, and Lee & Associates).[1]

Since plan confirmation, Debtor-Appellee has paid all of the general unsecured and priority claims of non-insiders, including the few claims not held by Lender-Appellants, in full.  Although those claims were paid from Lender-Appellants' cash collateral, in the event this Court reverses the Bankruptcy Court, Lender-Appellants agree that they will not seek disgorgement of those funds from the non-insider unsecured and priority creditors.[2]

Under these facts, it is entirely possible for the bankruptcy court "to fashion equitable relief without completely undoing the plan."  *Transwest*,

---

[1] The remaining creditor, Maxwell Morgan, LLC, is an insider of the Debtor-Appellee and was not entitled to vote on the plan.  Excerpt, pp. 217, 296. Although there were a few other precautionary claims, they were owed no money. The Internal Revenue Service amended its claim to show that no money was owed. Excerpt, p. 85.

[2] Pursuant to 11 U.S.C. § 363(c)(2)(A), a debtor in possession can use cash collateral with the consent of its secured lender.

4

70068416.2

801 F.3d at 1171. Although confirmation of the existing confirmed plan itself would be reversed, the non-insider unsecured creditors would still keep the benefit of the payments in full they have received under that plan. The bankruptcy case would essentially become a two party dispute between Lender-Appellants, on one hand, and Debtor-Appellee and its insider Maxwell Morgan, LLC, on the other hand. The remaining two-party issues would not create an uncontrollable situation for the Bankruptcy Court.

## II.     ISSUES PRESENTED AND APPLICABLE STANDARD OF REVIEW

In this case, Debtor-Appellee initially proposed a plan of reorganization that classified all of its general unsecured claims into a single class. Lender-Appellants purchased 11 general unsecured claims and voted those claims against the Debtor-Appellee's proposed plan. Only two general unsecured creditors voted for Debtor-Appellee's plan.

After the balloting was complete, Debtor-Appellee filed an amended plan that reclassified the 11 claims voting against the plan into a new class, leaving the two creditors voting for the plan and the non-voting creditors in the original class. The amended plan treated the new class of claims identically to the original class of claims. Debtor-Appellee also filed a motion to designate (i.e. disqualify) the votes of Lender-Appellants as not having been made in good faith.

5

The Bankruptcy Court entered the Designation Order, designating and disregarding the votes on the general unsecured claims that Lender-Appellants purchased. The Bankruptcy Court also entered the Confirmation Order, confirming the amended plan that separately classified the general unsecured claims owned by Lender-Appellants from the other general unsecured claims.

This appeal presents the following issues:

(1) Did the Bankruptcy Court err when it permitted the Debtor-Appellee to gerrymander and reclassify the claims that Lender-Appellants purchased?

(2) Did the Bankruptcy Court err when it designated the votes on claims Lender-Appellants purchased?

With respect to the first issue, a "bankruptcy court's finding that a claim is or is not substantially similar to other claims, constitutes a finding of fact reviewable under the clearly erroneous standard." *Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1523 (9th Cir. 1996), citing *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 3232, 327 (9th Cir. 1994). However, determination of the legal limitations on classification of claims is reviewed *de novo*. *Barakat*, 99 F.3d at 1523. As a matter of law, similar claims cannot be classified differently in order to gerrymander an affirmative vote on a reorganization plan, nor can similar claims be classified separately absent a legitimate business or economic reason. *Barakat*, 99 F.3d at 1525-26.

6

70068416.2

In reviewing a finding of fact for clear error, an appellate court may reverse if it is "left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511 (1985), *quoting United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542 (1948). An appellate court "may regard a finding of fact as clearly erroneous not only if it is without adequate evidentiary support, but also if it was induced by an erroneous view of the law." *Wall Street Plaza, LLC v. JSJF Corp. (In re JSJF Corp.)*, 344 B.R. 94, 99 (9th Cir. B.A.P. 2006), *aff'd* 277 Fed. Appx. 718 (9th Cir. 2008), *quoting Power v. Union Pac. R.R. Co.*, 655 F.2d 1380, 1382-83 (9th Cir. 1981) (citations omitted); *see Slottow v. American Cas. Co. of Reading, Pennsylvania*, 10 F.3d 1355, 1359 (9th Cir. 1993) (applying this standard to a district court's ruling as to good faith).

With respect to the second issue, this Court must review the Bankruptcy Court's decision to designate for clear error. The Ninth Circuit Court of Appeals has set forth the following standard of review on appeal:

> "To the extent that our review requires us to define the general parameters of a good faith determination, we are reviewing a question of law. To the extent that we must review a pure historical fact determination, we are reviewing a question of fact. But, a determination of good faith can partake of both, and we often review mixed questions of law and fact de novo. Nevertheless, a decision that someone did or did not act in good faith is one where the determination is 'an essentially factual inquiry' and is driven by the 'data of practical human experience.' For that reason, we have, in various contexts, declared that we will review good faith

7

determinations for clear error.  Therefore, we will review the bankruptcy court's ultimate good faith determination for clear error."

*Figter Ltd. v. Teachers Ins. & Annuity Assoc. of Am. (In re Figter Ltd.)*, 118 F.3d 635, 638 (9th Cir. 1997).

A finding of good faith requires the bankruptcy court to consider "all of the militating factors" and to conduct a "quite broad" inquiry.  *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1390 (9th Cir. 1982) (superseded by statute on other grounds); *Drummond v. Welsh (In re Welsh)*, 711 F.3d 1120, 1127-32 (9th Cir. 2013) (recognizing continued vitality of *Goeb*, except where Congress has enacted specific limitations on good faith inquiry).  No single factor can be dispositive of the ultimate result, nor may the court consider only a single set of factors.  *Figter*, 118 F.3d at 639-40.  A bankruptcy court commits clear error when, instead of conducting a broad-ranging inquiry, the bankruptcy court relies exclusively on one or two factors to find bad faith.  *Goeb*, 675 F.2d at 1391; *Meyer v. Lepe (In re Lepe)*, 470 B.R. 851, 856-57 (9th Cir. B.A.P. 2012) ("In short, *Goeb* established that, in this circuit, a good faith determination in connection with chapter 13 plan confirmation cannot be based on any single factor or feature of a proposed plan, to the exclusion of review of all other relevant information.   Importantly, it is of no moment that a single factor may be indicative of bad faith, . . . .  Factors indicating good and bad faith may not be considered in isolation, but must always be weighed against the totality of the circumstances in each case.")

8

This court is not precluded from reviewing errors of law that arise in a good faith analysis. If a bankruptcy court fails to consider all the factors relevant to good faith, that is an issue of law that must be reviewed *de novo*. *Hedlund v. Educ. Res. Inst. Inc.*, 718 F.3d 848, 854 (9th Cir. 2013).

## III. STATEMENT OF THE CASE

### A. Debtor-Appellee's Bankruptcy Filing and Initial Plans of Reorganization

On August 14, 2014, Debtor filed a voluntary petition under Chapter 11. Excerpt, pp. 1-11. Lender-Appellants are the primary secured creditor in the Debtor-Appellee's bankruptcy case. Lender-Appellants hold a secured claim in excess of $4 million.

On November 14, 2014, Debtor-Appellee filed a plan of reorganization, and on April 27, 2015, Debtor-Appellee filed a first amended plan of reorganization. Excerpt, pp. 52-84, 88-122. Both the original and the first amended plan provided for separate classes of creditors. The Lender-Appellants' secured claim was in one class, Class 1. All of the general unsecured creditors were classified together into another class, Class 4. Excerpt, pp. 62, 99. To confirm the plan under the Bankruptcy Code, the Debtor-Appellee needed at least one impaired class to approve the plan. 11 U.S.C. § 1129(a)(10). Plan approval by a class requires a favorable vote by one-half of the number, and two thirds of the dollar amount, of the creditor claims voting in that class. 11 U.S.C. §1126(c).

9

## B. Lender-Appellants' Purchase of General Unsecured Claims.

The Lender-Appellants did not agree with the Debtor-Appellee's proposed treatment of their claim under the Plan and intended to vote their secured claim against the Plan. In order to advance their own economic interests, the Lender-Appellants also purchased a number of general unsecured claims. The evidence is undisputed that the purpose of the purchases was for Lender-Appellants to vote the purchased general unsecured claims against the Plan and protect their secured claim. Excerpt, pp. 454-55, 460.

Lender-Appellants gave their lawyer a budget to purchase claims. However, the budget was insufficient to purchase all of the claims. Excerpt, pp. 428, 439, 444.

Lender-Appellants purchased claims from Atlas Waste Management, Inc., Skov Auto Parts, Inc., DHL Express (USA), Inc., Elias Enterprises, Inc., O'Connor & Sons, Inc., MSC Industrial Direct Co., Inc., J.B. Dixon Engineering & Surveying, Inc., Kurtz North America, Inc., James Larry Good, Zalco Laboratories, Inc., and the claim of Culligan San Paso Co. controlled by the Credit Bureau. Excerpt, pp. 201-11. The purchased claims are more than one-half in number of the claims in the unsecured creditor class.

Lender-Appellants did not purchase claims from Den Mat Holdings, LLC, Southern California Gas Co., and MarksNelson CPA because those creditors

10

actually had no claims to sell. The Debtor owed these three claimants no money. Excerpt, pp. 29-33, 438, 440-41, 443.

Lender-Appellants attempted to purchase claims from CT Corporation (which refused to sell), Federal Express (which had two claims and refused to sell both), McMaster-Carr Supply Co. (which stated that it had sold its claim to a collection agency but would not disclose the name of the agency), Santa Barbara Public Works (which refused to sell), and Secretary of State-VN (who Lender-Appellants tried diligently to reach but either received no response or the creditor refused to sell). Excerpt, pp. 438-43. Collectively, these claims that Lender-Appellants attempted, but was unable, to purchase totaled $1,398.07. Excerpt, pp. 11-18, 29-33.

Ultimately, there were only three claims in the general unsecured creditors' class that Lender-Appellants did not attempt to purchase. Lender-Appellants did not attempt to purchase the claim of Lee & Associates, because of concerns about a close relationship between the Debtor-Appellee and Lee & Associates and because the claim exceeded the budget. Excerpt, pp. 428, 439-40. Lender-Appellants also did not attempt to purchase two claims from the City of Lompoc controlled by Credit Bureau, both because those claims exceeded the

11

budget and because the Debtor had indicated that it had an objection to the larger of the two claims.[3]  Excerpt, pp. 134, 443-52.

There were no other claims in the general unsecured creditors class entitled to vote.[4]

### C.    Debtor-Appellee's Second Amended Plan and Balloting

On June 2, 2015, Debtor-Appellee filed a second amended plan of reorganization.  Excerpt, pp. 286-319.  As in the original plan and the first amended plan, the Lender-Appellants' secured claim was in one class (Class 1), and all of the general unsecured creditors were classified together into another class (Class 4).  Excerpt, pp. 294-96.

Lender-Appellants voted their secured claim—and all 11 of the unsecured claims they purchased—against the plan.  The Debtor-Appellee filed its Summary of Acceptances and Rejections on June 5, 2015.  The summary showed that, after balloting, no impaired consenting class approved the plan.  Excerpt,

---

[3] Debtor-Appellee did object to the City of Lompoc's large claim on May 7, 2015. The Debtor-Appellee and the City of Lompoc settled that objection on August 31, 2015.  Excerpt, pp. 199-200, 462-64.

[4] Lender-Appellants did not attempt to purchase the claims of parties in other classes who were not entitled to vote.  The claim of Maxwell Morgan, LLC, was separately classified (Class 3).  As an insider, Maxwell Morgan, LLC, was not entitled to vote.  Excerpt, pp. 98.  The Franchise Tax Board and the Internal Revenue Service each filed proofs of claim asserting priority under 11 U.S.C. § 507(a)(8).  Priority tax claims were unclassified under the plan and were not entitled to vote.  Excerpt, pp. 19-21, 48-51, 95-96.  The Internal Revenue Service later amended its claim to show no money was owed to it.  Excerpt, pp. 85-87.

70068416.2

pp. 320-22.  Other than Lender-Appellants, only two creditors voted.  Excerpt, pp. 320-22, 429-30.

### D.   Debtor-Appellee's Motion to Designate and the Initial Hearing on Plan Confirmation

On June 9, 2015, the Debtor-Appellee filed Debtor's Motion to Designate Votes, attempting to disqualify the votes submitted by Lender-Appellants in the general unsecured creditors' class.  Excerpt, pp. 323-33.

The confirmation hearing commenced on June 10, 2015.  At that hearing, the Bankruptcy Court denied confirmation of the first amended plan.  Excerpt, pp. 334-35, 337.  The Bankruptcy Court, the Debtor-Appellee, and Lender-Appellants agreed that it was unnecessary to solicit additional votes on the second amended plan because the only change was a "slight improvement to the payment timing" for the general unsecured creditors in Class 4, and that "essentially it's the same plan."  Excerpt, pp. 338-39.

Although some evidence on confirmation was taken at the hearing on June 10, 2015, the confirmation hearing was continued to August 25, 2015.  The Bankruptcy Court also continued the hearing on Debtor-Appellee's Motion to Designate Votes to August 25, 2015.

Lender-Appellants opposed the motion to designate their votes.  Excerpt, pp. 341-59.  Lender Appellants also opposed confirmation of the plan.  Excerpt, pp. 360-70, 374-90.

70068416.2

### E. Debtor-Appellee's Third Amended Plan

On August 20, 2015, five days before the continued confirmation hearing was to proceed, Debtor-Appellee filed its Third Amended Plan of Reorganization. Excerpt, pp. 391-424. The third amended plan gerrymandered the unsecured creditors class into two different classes: those claims that Lender-Appellants voted against the plan were moved into a new class (Class 1B), and the two unsecured claims that voted for the plan remained in the existing class of unsecured creditors (Class 4), along with other claims that did not vote. Excerpt, pp. 400-02.

No new balloting took place after the unsecured creditors' class was gerrymandered. However, in apparent anticipation of filing the third amended plan, Debtor-Appellee filed an Amended Summary of Acceptances and Rejections on August 14, 2015. Excerpt, pp. 371-73. This amended ballot summary showed that Lender-Appellants' claims in Class 1B voted against the plan, and the only two remaining voting creditors in Class 4 voted for the plan.

### F. The Continued Confirmation Hearing

At the outset of the hearing on August 25, 2015, the Bankruptcy Judge started out by addressing the motion to designate:

> THE COURT: But I will say that one question that I want answered either by you or by Mr. Eldan is whether or not the bank offered to buy all the claims, or did they just buy a few. Did they just offer to buy a few? And I think Mr. Monson's client could also respond to that. Mr. Monson represents one of the creditors in the case. So you

14

don't have to answer now, Mr. Eldan, but that is going to be a question that I want answered.

MR. ELDAN: I'll be happy to answer it now, Your Honor. I did not attempt to buy every claim in the case. I attempted to buy most of them. With respect to any claim that I did not attempt to buy, there were specific and, in my view, good reasons to not attempt to buy it such as it was scheduled by the debtor at zero or the debtor itself had suggested that the claim was invalid and had been scheduled mistakenly. And in the case of Lee & Associates, which is the largest unsecured creditor for $50,000, first of all, that I thought that there was a possibility that it had business ties with the debtor as its broker, but, more importantly, the claim was far too large for the bank to be willing to go and -- and buy it as it bought the other claims.

Excerpt, pp. 427-28.

After hearing some argument from Lender-Appellants' counsel

regarding the motion to designate, the Bankruptcy Judge indicated that she thought

the decision on designation was a matter of law and that it was determinative that

Lender-Appellants did not offer to buy every unsecured claim:

THE COURT: And in those cases [*Figter* and *Pleasant Hill*], because I studied those cases, the unsec- -- the secured creditor offered to buy every claim. And in one of the cases, one creditor didn't -- for $24.00 didn't consent. And in the other case, maybe there was a couple who didn't consent. But it was every creditor. Every unsecured creditor was offered the same deal by the secured creditor.

And that's not what happened here. So I'm not going to consider -- I'm not considering that. I'm going to have the motion to designate. I'm not considering it as a matter of law.

If you had offered to buy -- if your client had offered to buy every claim including Mr. Monson's and including Mr. Lee and including the bigger ones, that would be different. But that's not what happened.

15

Excerpt, p. 429.  The Bankruptcy Judge later continued:

> THE COURT:  . . . So that's my preliminary look at it which is -- you
> didn't offer -- you didn't put yourself in the same situation that the
> creditors did in those -- in those two cases.  So I'm -- I'm not
> considering it as a matter of law.

Excerpt, p. 432.  The Bankruptcy Judge stated that was a "huge factor" that

Lender-Appellants did not offer to buy all of the unsecured claims.  Excerpt,

p. 433.

In deciding the motion to designate, the Bankruptcy Judge treated the

question as a legal issue, not a factual issue.  When Lender-Appellants offered to

put on testimony regarding their purchase of claims, the Bankruptcy Judge stated

that she did not think testimony was necessary:

> MR. ELDAN: As I said, I'm happy to testify about the purchase of
> claims and my rationale for each and every one of them.

> THE COURT: I -- I really don't think that's necessary.  I think the
> division is there was a huge number that weren't purchased, a huge --
> a huge number in amount.

> MR. ELDAN: Uh-huh.

> THE COURT: I mean, not even counting – I didn't even think about
> the -- the insider claims.  I'm just talking about the noninsider claims.
> The amount the bank purchased and offered to purchase given the
> amount of noninsider claims, that difference is so huge that that is
> what is -- I'm keying in on.

Excerpt, pp. 434-35.

Although ultimately the Bankruptcy Court allowed Lender-Appellants to make their factual record, the Bankruptcy Judge stated that she did not think the circumstances regarding the purchase of the claims mattered:

> MR. HERCHER: Your Honor, our -- if I -- our next witness would be Mr. Eldan to offer evidence regarding the circumstances regarding the claim purchases, the issue that was addressed at the outset of the hearing today.
>
> THE COURT: Well, really? My question had to do with did he offer to purchase all of them, and the answer was no. And if you want to get him on the stand to tell me that, I'm happy to do that.
>
> I don't really care the circumstances by which he chose some and not others. What -- what I know is he purchased some -- the bank purchased some and not others, and to me that is the difference. I don't care why he chose what he chose. If you want -- if you think that it matters, put him on the stand, but you need to realize for me that's not a deciding factor.

Excerpt, p. 436.

At the end of the Lender-Appellants' direct testimony, the Bankruptcy Judge again reiterated that her key issue was that the Lender-Appellants did not offer to purchase all the claims:

> THE COURT: And you had some creditors who said no. Fine. But you also had creditors that you chose not to offer it to. And so for me that's an issue about whether or not I'm going to designate the claims.

Excerpt, pp. 457-58.

## G.     The Bankruptcy Court's Ruling

On September 1, 2015, the Bankruptcy Court heard closing arguments on the motion to designate votes and confirmation of the plan, and announced its

17

ruling from the bench. With respect to the Motion to Designate, the Bankruptcy

Court ruled as follows:

> THE COURT: . . . So, first, I am going to deal with the designation. Coastline purchased certain unsecured Class 4 claims and voted all of those claims against confirmation. If those votes are counted, debtor will not be able to main -- to obtain an accepting impaired class as required by Section 1129(a)(10).

> Debtor requests that the votes of the purchased claims be designated pursuant to 11 USC Section 1126(e). For reasons that follow, I will grant debtor's motion to designate which should not come as any surprise to anyone after last Tuesday's hearing.

> Coastline's attorney David Eldan testified that he arranged for Coastline to purchase 11 Class 4 claims for the purpose of blocking confirmation of debtor's plan. The claims purchased by Coastline total approximately $13,000.

> Now, my calculation was 13,287.02. If I subtract the debtor's -- the creditor's previous claim from the most current claim, it's 12,553.46. And I think the difference between those two numbers is I was using the proof of claim amount and Mr. Eldan's change in the claim was the amount they paid which wasn't a hundred cents on the dollar for the biggest two claims that they bought. So for purposes of this discussion, I'm going to use the 13,000.

> And that was about 10 percent of the unsecured debt in the case after claims were purchased and is now about 13 percent of the allowed claims if I take into account the fact that the -- the City of Lompoc's claim of 54,000 has been agreed to be reduced to 35,000.

> Coastline did not offer to purchase all of the Class 4 claims. In particular, Coastline did not offer to purchase the claims held by Lee & Associate [sic] in the amount of 50,000 and the City of Lompoc utilities in the approximate amount of 54,700 which has been compromised and agreed by both parties to be 35,000.

> Mr. Eldan testified that he did not purchase those two claims because each exceeded the budget allowed by his client. He also testified that

18

he was not sure of the nature of the relationship between Lee & Associates, and he did not want to tip off -- tip off debtor to Coastline's plan to acquire a blocking position.

And with respect to the City of Lompoc, he did say that there was at least some discussion about that claim not being an allowed claim.

So Section 1126(e) allows the court to, quote, designate any entity whose acceptance or rejection of such plan was not in good faith. In this context, "designate" means to disqualify from voting. *In re Figter*, 118 F3d 635 at page 638, Ninth Circuit, 1997.

Courts should employ 1126(e) sparingly and the parties seeking such designation bears the burden of proof. *In re DBSNNM [sic], Inc.*, 634 F3d 79 at pages 101 to 102, Second Circuit, 2011.

The plan of reorganization under consideration proposes to pay Class 4 claims in full with interest within 60 days of confirmation. It is undisputed that unsecured creditors will not be paid in a liquidation or in the event this reorganization fails and Coastline forecloses.

I conclude that designation is appropriate in this case because Coastline will have an unfair advantage over the unsecured creditors who did not receive a purchase offer and who hold the largest percentage of claims in this case in terms of amount.

In making a good faith determination under Section 1126(e), the Ninth Circuit instructed in *Figter* that the concept of good faith is a fluid one and that, although prior cases can offer guidance, a bankruptcy court must ultimately make each good faith determination with an understanding derived from its informed practical experience in dealing with debtors and creditors. *Figter* 118 F3d at 639 to 40.

Good faith does not require a creditor to act with selfless disinterest. And the fact that a creditor purchases claims to take a blocking position is not, per se, bad faith under Section 1129 -- 1126(e). However, a creditor's conduct in further of its own interest should not result in an unfair disadvantage to other creditors. *In re Pleasant Hill Partners, LP*, 136 BR 388, 395, Bankruptcy Northern District of Georgia, 1994.

70068416.2

That principle was a factor in – in *Figter* where the court affirmed the
bankruptcy court's denial of a motion under Section 1126(e).  In
doing so the court in *Figter* specifically noted that the secured creditor
offered to purchase all of the unsecured claims at issue.  *See also In re
DeLuca*, 194 BR 797, Bankruptcy Eastern District of Virginia, 1996.
*In re 255 Park Plaza Associate Limited Partnership*, 100 F3d 1214,
Sixth Circuit, 1996.

Allowing Coastline to block confirmation by purchasing such a small
percentage of the unsecured debt in this case would be highly
prejudicial to the creditors holding most of the unsecured debt; and,
therefore, I am going to designate.

Excerpt, pp. 469-73.

With respect to reclassification, the Bankruptcy Court ruled that the

11 claims that Lender-Appellants purchased could be removed from Class 4 and

put into a new Class 1B:

THE COURT: . . .Class 1A -- so now I am going to look a little bit to
your third amended plan because in that you -- so I assume you would
move for the amendments contained in your third amended plan.  And
you're affirmatively nodding, yes, Mr. Pahl –

MR. PAHL: Yes, Your Honor.

THE COURT: -- because the record will not reflect that. So Class 1A
consists of Pacific's allowed secured claim and -- and Class 1B
consisting of the claims purchased by -- I'm not sure if it's Coastline
or Pacific, but I'll treat them as the same.  And you wanted to put
them there because they were secured. I don't think that's the fact. I
think the claims are as the claims were when the case was filed. They
remain unsecured claims.  But putting them in Class 1A and 1B is fine
with me so that -- because Class 1B is treated as -- the same as the
unsecured Class 4; right?

MR. PAHL: Yep.

70068416.2

Excerpt, pp. 474-75. The Bankruptcy Court then held that, because the unsecured claims purchased by Lender-Appellants were designated and reclassified into Class 1B, Class 4 was an impaired consenting class that approved the plan. Excerpt, pp. 477, 487-88.

The Bankruptcy Court stated that it would confirm the plan, subject to amendments that are not at issue in this appeal. Excerpt, p. 492.

At the hearing on September 1, 2015, both before and after the Bankruptcy Court's ruling, counsel for Lender-Appellants asked the Bankruptcy Court to make findings of fact on the issue of good faith and on reclassification of the general unsecured claims into the new gerrymandered classes, but the Bankruptcy Court refused. Excerpt, pp. 467-68, 493-95.

### H. Entry of the Final Orders.

The Debtor-Appellee submitted the order confirming the plan, along with a fourth amended plan including the amendments required by the Bankruptcy Court. The Bankruptcy Court entered the Designation Order on September 9, 2015, and the Confirmation Order on September 14, 2015. The fourth amended plan attached to the Confirmation Order plainly contains the two gerrymandered classes. Excerpt, pp. 514-15.

## IV. SUMMARY OF THE ARGUMENT

When the Bankruptcy Court entered the Confirmation Order, it approved the gerrymandering of the claims owned by Lender-Appellants into

70068416.2

Class 1B, separate from the other similar general unsecured claims in Class 4. Doing that was contrary to binding authority in the Ninth Circuit, which prohibits gerrymandering of claims for the sole purpose of obtaining consent to a chapter 11 plan. It was also clear error, because the record did not contain adequate evidentiary support to classify claims in Class 1B separately from claims in Class 4, and the Bankruptcy Court made no findings of fact to support separate classification.

The Bankruptcy Court also committed clear error when it entered the Designation Order disqualifying the Lender-Appellants' votes on the plan as not having been made in good faith. The Bankruptcy Court erroneously believed that good faith was a question of law. As a result, instead of conducting a broad-ranging inquiry into the facts, and making appropriate factual findings, the Bankruptcy Court erroneously fixated on only one factor—that Lender-Appellants did not attempt to purchase claims from two claimants—and relied on that factor to the exclusion of all else in determining good faith.

## V.     ARGUMENT

### A.     The Bankruptcy Court Erred When it Permitted Debtor-Appellee to Gerrymander and Reclassify the Unsecured Claims Purchased by Lender-Appellants.

#### 1.     *Substantially similar claims must be classified together.*

The Ninth Circuit Court of Appeals has held that, when reviewing a decision on classification, the proper inquiry is "are the claims substantially

similar?" *Johnston*, 21 F.3d at 327. To resolve the question, bankruptcy court judges must evaluate the specific nature of each claim as a factual matter. *Id.* As a matter of law, there are limits on classification of claims. It is impermissible to separately classify general unsecured claims without a legitimate business or economic justification. *Barakat*, 99 F.3d at 1526.

Here, the Bankruptcy Court erred, because it made no findings of fact regarding the nature of the claims that were reclassified into Class 1B compared to the claims that remained in Class 4 of the plan. The Bankruptcy Court did not find substantive differences between the claims, because there was no evidence of any substantive difference between the claims. Without a legitimate business reason or economic justification supported by facts to separately classify these claims, the separate classification was improper.

In this case, there was no appropriate factual basis for the Bankruptcy Court to separately classify the general unsecured claims that Lender-Appellants purchased from the other general unsecured claims. First, all of the claims in Class 1B and Class 4 were general unsecured claims. Although Debtor-Appellee contended that the claims in Class 1B should be treated as secured claims, the Bankruptcy Court properly rejected that contention. Excerpt, pp. 474-75, 493.

Second, the Debtor-Appellee's own decisions show that the claims are similar and should be classified together. The Debtor-Appellee's original plan,

first amended plan, and second amended plan classified all the general unsecured claims together in Class 4.

Third, under the confirmed plan, all of the claims in Class 1B and Class 4 received exactly identical treatment. The plan provided that each claimant in Class 1B and Class 4 would receive payment, in cash, in the amount of their claim, plus three percent, within 60 days after the effective date of the plan. Excerpt, pp. 514-15. If there had been a legitimate business reason or economic justification to classify the claims separately, one would expect the different classes to receive different treatment.[5]

The Bankruptcy Court erred when it articulated no reason at all for allowing the separate classification. The Bankruptcy Court's only comment on reason for separate classification was that it was "fine" because Class 1B would receive the same treatment as Class 4.

### 2. *Claims cannot be gerrymandered into different classes just to obtain consent to a chapter 11 plan.*

Binding authority establishes that separate classification of similar claims, where the sole purpose of separate classification is to obtain acceptance of

---

[5] Even though the Debtor-Appellee contended that the claims that Lender-Appellants purchased were secured claims, Debtor-Appellee made no effort to treat those claims as secured claims. No version of the plan ever provided for Lender-Appellants to retain any lien on account of these claims, for Debtor-Appellee to sell the collateral supporting these claims, or to provide Lender-Appellants the indubitable equivalent of these claims, as required by 11 U.S.C. § 1129(b)(2)(A).

70068416.2

a chapter 11 plan, is prohibited. *Barakat*, 99 F.3d at 1526. Here, the only purpose of separate classification was to obtain a consenting class to support Debtor-Appellee's plan.

Debtor-Appellee's original plan, first amended plan, and second amended plan each classified all of the non-insider, general unsecured claims in Class 4. It was not until after all the votes were submitted, no class had accepted the Debtor-Appellee's plan, and the confirmation hearing commenced that the Debtor-Appellee filed its third amended plan to gerrymander the votes and move the claims purchased by Lender-Appellants into a new Class 1B. Debtor-Appellee provided no evidence of any other purpose for the separate classification.

### 3. The authority cited by Debtor-Appellee did not support reclassification and gerrymandering.

Debtor-Appellee cited two cases to the Bankruptcy Court to support its post-balloting reclassification of the unsecured claims. *In re Loop 76, LLC,* 465 B.R. 525 (9th Cir. B.A.P. 2012); *CW Capital Asset Mgmt., LLC v. Burcam Capital II, LLC,* 2014 WL 2864678 (E.D.N.C. June 24, 2014). Neither of these cases supports reclassification and gerrymandering of the general unsecured claims in this case.

In *Loop 76*, the Ninth Circuit Bankruptcy Appellate Panel held that a bankruptcy court can separately classify claims that are not "substantially similar." *Loop 76*, 465 B.R. at 536. However, in *Loop 76*, unlike in this case, there was a

70068416.2

factual difference between the separately classified claims—the lender's unsecured deficiency claim in *Loop 76* differed from the claims of other general unsecured creditors because there was a third party who was also obligated to pay the deficiency claim. *Loop 76*, 465 B.R. at 541. Here, there are no facts in the record to distinguish the claims that Lender-Appellants purchased from the claims that remained in Class 4.

*Loop 76* also does not support Debtor-Appellee's gerrymandering. Indeed, in *Loop 76*, the Bankruptcy Appellate Panel specifically recognized the holding in *Barakat* that "a court may not approve a plan placing similar claims differently solely to gerrymander an affirmative vote on the reorganization plan"—precisely what Debtor-Appellee did in this case. *Loop 76*, 465 B.R. at 537, *citing Barakat*, 99 F.3d at 1525.

*CW Capital* also supports Lender-Appellants' argument. In *CW Capital*, the District Court in North Carolina held that separate classification "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims," and "classification [that] is clearly for the purpose of manipulating voting . . . may not stand." *CW Capital*, 2014 WL 2864678 at *2, *quoting Travelers Ins. Co. v. Bryson Props. XVIII (In re Bryson Props. XVIII)*, 961 F.2d 496, 502 (4th Cir. 1992) (internal citations omitted). A plan modification to "segregate all the 'no votes' into a single class,

26

allowing for ultimate confirmation . . . is obvious gerrymandering." *CW Capital*, 2014 WL 2864678 at *4.

### B. The Bankruptcy Court Erred in Designating and Disqualifying Lender-Appellants Votes Against the Plan.

In a bankruptcy case, the law allows a creditor to act in its own enlightened economic self-interest in voting its claims. *Figter*, 118 F.3d at 639. Here, the evidence was undisputed that Lender-Appellants acquired unsecured claims and voted those claims to protect Lender-Appellants' secured claim—and for no other purpose. As such, Lender-Appellants' actions were in good faith.

The Bankruptcy Court erred because it did not consider the facts and circumstances surrounding Lender-Appellants' votes and whether Lender-Appellants' actually acted in good faith. Instead, the Bankruptcy Court fixated on one factor to the exclusion of all else: the assumed effect of Lender-Appellants' vote on two unsecured creditors whose claims that Lender-Appellants did not (for good reasons) offer to purchase.

The Bankruptcy Court's decision was clear error, because the Bankruptcy Court did not engage in the wide-ranging inquiry into the facts required for a determination of good faith. Instead, the Bankruptcy Court impermissibly focused on one factor—an approach expressly rejected by the Ninth Circuit Court of Appeals. Under *Hedlund*, the Bankruptcy Court's failure to

27

consider all the factors relevant to good faith is an issue of law that must be reviewed *de novo*. *Hedlund*, 718 F.3d at 854.

The Bankruptcy Court's decision was also induced by an erroneous view of the law. The Bankruptcy Court's ruling was tantamount to a decision that Lender-Appellants were acting in bad faith if they did not offer to purchase all the claims. The law does not require a creditor to offer to purchase all claims before its votes will count on any of the claims it purchases.

### 1. *The legal parameters for determining good faith.*

Whether a party has acted in good faith is ultimately a question of fact. *Figter*, 118 F.3d at 638. However, prior binding authority has established certain legal parameters and conduct that are acceptable behavior and are consistent with acting in good faith. In *Figter*, the Ninth Circuit Court of Appeals specifically addressed the whether a creditor acquires and votes claims in good faith. In that case, the Court of Appeals carefully distinguished between a creditor acting with "mere enlightened self-interest," which is done in good faith, and a creditor acting with an "ulterior motive," which could constitute lack of good faith. *Figter*, 118 F.3d at 639.

A lack of good faith is not shown when a creditor chooses to benefit its interest as a creditor as opposed to some unrelated interest. *Figter*, 118 F.3d at 639. "'As long as a creditor acts to preserve what he reasonably perceives as his

28

fair share of the debtor's estate, bad faith will not be attributed to his purchase of claims to control a class vote.'" *Id., quoting In re Gilbert*, 104 B.R. 206, 217 (Bankr. W.D. Mo. 1989).

Each of the cases cited in *Figter* by the Court of Appeals as examples of a creditor acting with an ulterior motive involve the acquisition of claims by one who was not previously a creditor of the debtor or the acquisition of claims for a purpose other than advancing the creditor's perceived self-interest with respect to its claim. *Figter*, 118 F.3d at 639.

### 2.   *The Bankruptcy Court's decision was induced by an erroneous view of the law.*

A bankruptcy court commits clear error when its decision is induced by an erroneous view of the law. *JSJF Corp.*, 344 B.R. at 99.

Here, the Bankruptcy Court erroneously believed that the decision whether to designate Lender-Appellant's votes was a question of law, not a question of fact. Excerpt, pp. 429, 432. As a result, the Bankruptcy Court did not conduct the required broad inquiry into the facts. *Goeb*, 675 F.2d at 1390. To the contrary—when Lender-Appellants offered to put on evidence about the purchase of claims and rationale for them, the Bankruptcy Judge said "I really don't think that's necessary" and "I don't really care the circumstances by which he chose some and not others." Excerpt, pp. 435-36.

70068416.2

Although the Bankruptcy Court eventually allowed Lender-Appellants to make their record, the Bankruptcy Court did not weigh all the factors in making its decision. Instead, the Bankruptcy Court focused solely on only one factor: the Bankruptcy Court believed that if it did not confirm the plan, it would be prejudicial to the unsecured creditors holding claims that Lender-Appellants did not offer to purchase. Excerpt, pp. 472-73. This fixation on only one factor in determining good faith was erroneous.[6] *Goeb*, 675 F.2d at 1390; *Figter*, 118 F.3d at 639-40.

The Lender-Appellants specifically asked the Bankruptcy Court to make findings of fact regarding good faith, but the Bankruptcy Court refused to do so. Excerpt, pp. 467-68, 493-95. Under these circumstances, this Court must reverse.

### 3. There is no legal requirement that Lender-Appellants offer to purchase all of the claims.

From the outset of the continued confirmation hearing, the Bankruptcy Court asserted that allowing the Lender-Appellants to vote the unsecured claims they purchased against the Plan would result in unfair disadvantage to other unsecured creditors. The Bankruptcy Court was troubled by the fact that the Lender-Appellants did not offer to buy all of the unsecured claims.

---

[6] Under *Hedlund*, this Court reviews the Bankruptcy Court's failure to consider all the factors relevant to good faith *de novo*. *Hedlund*, 718 F.3d at 854.

70068416.2

The Bankruptcy Court did not like the fact that some of the original unsecured creditors received payment (i.e., the purchase price) from the Lender-Appellants, but that the other unsecured creditors whose claims Lender-Appellants did not offer to purchase would receive nothing if the Plan was not confirmed. Ultimately, that assumption was the sole basis for the Bankruptcy Court's decision. That statement was tantamount to a holding that Lender-Appellants were required to offer to buy all of the unsecured claims in this case if they wanted their vote to count on behalf of any of the unsecured claims they had purchased.

In the oral ruling granting the designation motion and confirming the plan, the Bankruptcy Court cited *Figter* and three other cases for the proposition that a creditor's failure to offer to purchase all claims in a class means that the creditor's vote of any purchased claims lacks good faith: the 1994 decision of the Northern District of Georgia Bankruptcy Court in *In re Pleasant Hill Partners, L.P.*, 163 B.R. 388, 395 (Bankr. N.D. Ga. 1994), the 1996 decision of the Eastern District of Georgia Bankruptcy Court in *Principal Mut. Life Ins. Co. v. Lakeside Assocs. (In re DeLuca)*, 194 B.R. 797 (Bankr. E.D. Va. 1996), and the 1996 decision of the Sixth Circuit Court of Appeals in *255 Park Plaza Assocs. Ltd. P'ship v. v. Connecticut Gen. Life Ins. Co. (In re 255 Park Plaza Associates Ltd. P'Ship)*, 100 F.3d 1214 (6th Cir. 1996).

70068416.2

The Bankruptcy Court erred because nothing in *Figter*, or any other binding authority, requires a creditor offer to buy all the unsecured claims before it can vote on behalf of any of them. It is true that, in *Figter*, the Court of Appeals mentions that the purchasing creditor in that case made the same offer to purchase to all creditors. *Figter*, 118 F.3d at 637. But that statement was *dictum*, and nowhere in *Figter* did the Court of Appeals assert that such an offer was required as a condition of good faith.

Although the courts in the other three cases cited by the Bankruptcy Court also observed in *dicta* the fact that the creditor made offers to purchases all claims, none of those cases—or any other reported case of which Lender-Appellants are aware—holds that a creditor's offer to buy all claims is a legal prerequisite to establishing that the creditor voted its acquired claims in good faith.

Other courts have found that creditors purchasing claims have acted in good faith, even in situations where they do not attempt to purchase all of the other claims. In a 1992 decision of the Northern District of California Bankruptcy Court cited by the Ninth Circuit in *Figter*, *In re Marin Town Center*, 142 B.R. 374, 377, 380 (Bankr. N.D. Cal. 1992), the court rejected a designation motion after observing that the creditor had purchased "certain" unsecured claims in the case and without concerning itself with whether the creditor had offered to buy the remaining unsecured claims.

70068416.2

Similarly, in a 2015 decision of the Middle District of Florida Bankruptcy Court in *In re Monticello Realty Investments, LLC*, 526 B.R. 902 (Bankr. M.D. Fla. 2015),  the court also rejected a designation motion filed against a secured creditor that had acquired a single, separately classified unsecured claim, and the court held that the debtor plan proponent had improperly classified the acquired unsecured claim separately from other non-acquired unsecured claims. The court expressed no concern regarding whether the creditor had offered to buy the non-acquired claims.

Even Debtor-Appellee has conceded that there is no per se requirement for a purchasing creditor to make an offer to purchase all claims and that it is not necessarily bad faith for a creditor to purchase just enough claims to defeat a plan.  Excerpt, pp. 615-16.

### 4. There is no legal requirement that a creditor purchasing claims act to avoid harm to other creditors.

There is no legal basis for the proposition that a purchaser of claims acts in bad faith if it has no intent to harm other creditors, but the result of its lawful actions to benefit its own claim result in no payment to those other creditors.  The Ninth Circuit Court of Appeals has expressly recognized that in some circumstances, it is acceptable for a creditor acting to benefit its own claim to purchase additional claims for a blocking position, even if that blocking position could injure other creditors.  *Figter*, 118 F.3d at 640.

33

**5.** ***The record contains no evidentiary support to justify a finding that Lender-Appellants did not act in good faith.***

Second, there is no evidence in the record whatsoever to support a finding that Lender-Appellants acted for any purpose other than to protect their secured claim—a motive that the Ninth Circuit Court of appeals expressly recognize in *Figter* as permissible.

 a. Lender-Appellants were not competitors seeking an unfair advantage over the Debtor-Appellee's business.

Here, unchallenged testimony established that Lender-Appellants purchased unsecured claims for the purpose of protecting the secured claim. Excerpt, pp. 454-55, 460. It was undisputed that Lender-Appellants were a previous creditor of the Debtor-Appellee.

Lender-Appellants were not seeking to obtain some improper competitive advantage in the marketplace by trying to destroy a competitor, but were merely seeking payment of their secured claim. Lender-Appellants are a bank and its wholly-owned subsidiary. Lender-Appellants are not competitors of Debtor-Appellee. Although Debtor-Appellee hinted in the Motion to Designate Votes that one of Lender-Appellants might be a competitor in the business of holding and selling real estate at a profit, Excerpt, p. 329, Debtor-Appellee conducted discovery on this issue and was unable to obtain any facts to support such an argument. As a result, Debtor-Appellee did not pursue that argument at

70068416.2

the continued confirmation hearing on August 15, 2015, and offered no evidence

on it.  There is no evidence in the record that Lender-Appellants had any intent to

harm any other creditors.  The only evidence at trial was to the contrary—that the

Lender-Appellants were not trying to cause harm to competition.  Excerpt,

pp. 455-56.

> b.  Lender-Appellants were not a proponent of an alternate plan.

There is no evidence in the record from which the Bankruptcy Court

could find that Lender-Appellants were the proponent of an alternate plan.

> c.  Lender-Appellants were not seeking to harm other creditors.

There is no evidence in the record whatsoever that Lender-Appellants

were seeking, or had any motive, harm any other creditors in the case.

What the facts in this case do show is that Lender-Appellants had

reasonable and appropriate reasons not to offer to purchase the claims of Lee &

Associates and the City of Lompoc.  Lender-Appellants did not seek to buy the

claims of Lee & Associates was because of concerns about a close relationship

between the Debtor-Appellee and Lee & Associates and because the claim

exceeded the budget.  Excerpt, pp. 428, 439-40.  Lender-Appellants did not attempt

to purchase two claims from the City of Lompoc controlled by Credit Bureau, both

because those claims exceeded the budget and because the Debtor-Appellee had

indicated that it had an objection to the larger of the two claims. Excerpt, pp. 134, 443-52.

As this Court has recognized, a creditor does not lack good faith because it has a budget. Nor does a creditor lack good faith if it chooses not to offer to buy a claim of an entity with a close relationship to Debtor-Appellee. And, a creditor does not lack good faith by choosing not to offer to buy a disputed claim (particularly where, as here, the claim was later compromised for a much lower amount).[7] Excerpt, pp. 617-18.

> d. There was no legal or factual basis for the Bankruptcy Court to conclude that if the plan were not confirmed, the unsecured creditors would be unfairly prejudiced.

In its decision, the Bankruptcy Court relied heavily on a statement of the Bankruptcy Court for the Northern District of Georgia in *Pleasant Hill*. In that case, the bankruptcy court said that "[t]he creditor's conduct in furtherance of its own interest, however, should not result in unfair disadvantage to other creditors or the debtor." *Pleasant Hill*, 163 B.R. at 395. The *Pleasant Hill* case is not binding authority in this jurisdiction. Also, *Pleasant Hill* is distinguishable and does not support a finding of lack of good faith under the law and facts of this case. In *Pleasant Hill*, there were no large unsecured creditors. The 18 unsecured claims in that case totaled "slightly more than $7,000." 183 B.R. at 390. There is no

---

[7] If a creditor bought a disputed claim, and that claim was disallowed, the creditor would receive nothing.

36

indication in *Pleasant Hill* that any of these claims were disputed or were held by people close to the debtor.  That scenario differs from this case, where Lender-Appellants attempted to purchase all of the non-insider general unsecured claims, except for two large claims—one of which was disputed and the other was held by a creditor thought to be close to the debtor.

There are no facts in the record of this case to support the Bankruptcy Court's conclusion that the unsecured creditors would receive nothing if the Debtor-Appellee's plan were not confirmed.  The Bankruptcy Court had not ordered that the case would be dismissed or that relief from stay would be granted to Lender-Appellants if the plan were not confirmed.  If relief from stay were granted, and if Lender-Appellants completed a foreclosure, it is possible that unsecured creditors ultimately would receive nothing.  However, in this case, Lender-Appellants have never even filed a motion for relief from stay.

As a matter of law, the result of a bankruptcy court's decision not to confirm a plan is that the plan is not confirmed.  The debtor remains free to propose another plan, just as the creditor is free to seek other remedies, such as relief from stay, a conversion, or dismissal of the case.  But until a plan is confirmed or the case is dismissed, the parties' "rights and obligations remain unsettled."  *Bullard v. Blue Hills Bank*, ___ U.S. ___, 135 S.Ct. 1686, 1692-93 (2015) (chapter 13 case).

70068416.2

If the Bankruptcy Court had denied confirmation of the Debtor-Appellee's plan, any number of things could have happened. For example, the Debtor might have filed a new plan proposing treatment that Lender-Appellants would have voted for and that would have provided for payment of general unsecured claims. There is no evidence in the record to the contrary.

Even if the Bankruptcy Court had decided to dismiss the case or provide Lender-Appellants relief from stay if the plan failed, the result in the case would not be unfair or prejudicial to unsecured creditors. If the plan had not been confirmed, and if some future event made it so the unsecured claims that Lender-Appellants' purchased would receive nothing, then Lender-Appellants' would also receive nothing on account of the claims Lender-Appellants purchased. Either way, all of those unsecured claims would receive identical treatment. There is nothing unfair about that outcome.

## VI.    CONCLUSION

For the reasons set forth above, the Bankruptcy Court committed clear error when it allowed the Debtor-Appellee to separately classify the claims purchased by Lender-Appellants to gerrymander a consenting class for Debtor-Appellee's plan. The Bankruptcy Court also committed clear error when it designated the votes of Lender-Appellants as not having been made in good faith. The Bankruptcy Court erroneously treated designation as a matter of law, and

70068416.2

instead of conducting a broad-ranging inquiry of fact, improperly fixated on one factor as determinative of good faith.

This Court should reverse the decision of the Bankruptcy Court and remand for further proceedings.

Dated this 28th day of December, 2015.

*/s/ Teresa H. Pearson*

_____

Teresa H. Pearson, OSB No. 953750
David W. Hercher, OSB No. 812639
Miller Nash Graham & Dunn LLP

David K. Eldan, Admitted *Pro Hac Vice*
Parker, Milliken, Clark, O'Hara &
Samuelian

Attorneys for Appellants Pacific Western
Bank and Coastline RE Holdings Corp.

70068416.2

# CERTIFICATE OF COMPLIANCE WITH RULE

## 8015(a)(7)(B) OR 8016(d)(2)

This brief complies with the type-volume limitation of Rule 8015(a)(7)(B) or 8016(d)(2) because:

☒ this brief contains 9,378 words, excluding the parts of the brief exempted by Rule 8015(a)(7)(B)(iii) or 8016(d)(2)(D), or

☐ this brief uses a monospaced typeface having no more than 10½ characters per inch and contains [state the number of] lines of text, excluding the parts of the brief exempted by Rule 8015(a)(7)(B)(iii) or 8016(d)(2)(D).

Dated this 28th day of December, 2015.

*/s/ Teresa H. Pearson*

_____

Teresa H. Pearson, OSB No. 953750

70068416.2