IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| PACIFIC WESTERN BANK and ) | |
| COASTLINE RE HOLDINGS CORP., ) | |
| ) | |
| Appellants, ) | Case No. 3:15-cv-01792-MO |
| ) | |
| v. ) | |
| ) | |
| FAGERDALA USA - LOMPOC, INC., ) | April 18, 2016 |
| ) | |
| Defendant. ) | Portland, Oregon |
| _____) | |

**Oral Argument**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE MICHAEL W. MOSMAN

UNITED STATES DISTRICT COURT CHIEF JUDGE

1

2                          APPEARANCES

3

4   FOR THE APPELLANTS:    Ms. Teresa H. Pearson
                           Mr. David W. Hercher
5                          Miller Nash Graham & Dunn, LLP
                           111 S.W. Fifth Avenue, Suite 3400
6                          Portland, OR 97204

7

8

9   FOR THE APPELLEE:      Mr. Douglas R. Pahl
                           Perkins Coie, LLP
10                         1120 N.W. Couch Street, 10th Floor
                           Portland, OR 97209
11

12

13

14  COURT REPORTER:        Bonita J. Shumway, CSR, RMR, CRR
                           United States District Courthouse
15                         1000 S.W. Third Ave., Room 301
                           Portland, OR  97204
16                         (503) 326-8188

17

18  ALSO PRESENT:          Holly Hayes (by telephone)

19

20

21

22

23

24

25

1                    (P R O C E E D I N G S)

2              THE CLERK:  Your Honor, this is the time and place

3     set for oral argument in Case No. 3:15-cv-1792-MO, Pacific

4     Western Bank, et al. v. Fagerdala USA-Lompoc, Inc.

5              Counsel, can you introduce yourself for the record.

6              MR. PAHL:  I'm Doug Pahl, counsel for Fagerdala USA,

7     Inc.

8              MS. PEARSON:  Teresa Pearson of Miller Nash Graham &

9     Dunn for secured lenders Pacific Western Bank and Coastline RE

10    Holdings Corp.

11             MR. HERCHER:  David Hercher of the same client, same

12    law firm.

13             THE COURT:  We have someone here on the phone?

14             MS. PEARSON:  Your Honor, on the telephone is

15    in-house counsel for Pacific Western Bank, Holly Hayes.  I

16    understand she is here to just listen to the argument today.

17             THE COURT:  Ms. Hayes, can you hear -- Ms. Hayes, can

18    you hear what's going on in court all right?

19             MS. HAYES:  Yes, I can.  Thank you, Your Honor.

20             THE COURT:  All right.  Thank you.

21             We're here with a couple of questions.  The first is

22    the allegation that the bankruptcy court erred in granting the

23    motion to designate and in finding that the lender purchased

24    and voted the claims in bad faith.

25             I'm going to do my best to follow the standard of

review in *Figter*, which I think to the bankruptcy court's
factual findings requires me to review them for clear error,
and otherwise to apply the typical standard of review for mixed
questions or legal questions.

I'm going to just refer to lender and debtor, if
that's all right.

MS. PEARSON:  Yes, Your Honor.

THE COURT:  So the debtor argues that the bankruptcy
court advances several reasons for this bad faith finding, and
I think does so in an attempt to meet the ulterior motive
standard.  That is, the bankruptcy court referenced some -- at
least one case out of the Ninth Circuit with a slightly
different formulation of what it would take for it to be error
to grant the motion to designate.

I'm going to refer to this ulterior motive standard.
And so the debtor suggests several things relied on by the
bankruptcy court in a finding that this was bad faith.  One was
just the failure to purchase all but -- any but a small
percentage of the unsecured debt and votes; the second, that
the plan that was defeated would have paid many or all of the
unsecured creditors in full.  And, of course, that doesn't
happen once the plan is defeated.

The third is perhaps the most important one to me,
and that is that the lenders were oversecured; that they had
excess value on the property.  What that says to me is it says

something about the possibility of the lender acting with an
ulterior motive; that is, acting in bad faith.

So what I'm looking for is a reason for the lender to
do what it did that doesn't simply amount to advancing its
legitimate economic interests in the bankruptcy proceeding.  I
understand ulterior motive to be to gain some other sort of
advantage not of the type that you gain just by winning
legitimately in the bankruptcy proceeding and advancing your
property, your economic interests in such a proceeding.

So, for example, if you're oversecured, then whether
you get the plan approved or not approved, whether the whole
thing ends up in Chapter 11 or forcibly in Chapter 7, the
oversecured lender has, as best I can tell on this record, at
least, roughly the same outcome, but other people don't, and so
that -- accomplishing that sort of damage to other creditors,
where your outcome doesn't change much, is the sort of ulterior
motive that I think case law has in mind when it talks about
what bad faith is.

So I'm curious how the judge arrived at the
conclusion that the lender was oversecured and whether that
chain of reasoning even flows from the bare fact of being
oversecured.

And then it goes without saying that the unsecured
creditors faced an increased risk of receiving very little or
even nothing if the plan fails, even just by virtue of the

failure of the plan, or apparently the judge was concerned that the failure of the plan would sort of ineluctably drive things into Chapter 7.

So as I understand it, that's the debtor's basic position on why the judge was right. Those are the reasons that support the judge's decision, reasons that at least in part appear to me to be reviewable for clear error, and therefore that I should approve the granting of the motion to designate grounded in those reasons.

So let me start with the debtor. Have I got about right your argument about what the judge did and why she did it?

MR. PAHL: I think you've gotten most of it, most of it right, Your Honor.

I think I would suggest that the idea of ulterior motive is a simple bright line -- either you have an ulterior motive or you don't -- and if you have an ulterior motive, then you lack good faith, because I think there's more to the concept of good faith under 1126(e) than simply whether you have an interest outside of the bankruptcy case that's different.

If you were to accept that ulterior motive requires some outside-of-the-bankruptcy-case interest, then we're basically saying that good faith, there is no standard of good faith for conduct within the case. And I think it's really

1  within the case that the judge was mostly troubled.

2          THE COURT:  Let me ask it this way.

3          MR. PAHL:  Sure.

4          THE COURT:  If you took away the idea of the lender

5  being oversecured, would you pluck in other facts -- buying

6  only the minimum number of shares necessary, leaving other

7  people, you know, unpurchased, voting those shares, the minimum

8  number of unsecured shares to defeat the plan -- is that bad

9  faith?

10          MR. PAHL:  I think under some circumstances, it can

11  be.

12          THE COURT:  Well, I don't want it to be under some

13  circumstances.

14          MR. PAHL:  Sure.

15          THE COURT:  Because I'm only giving you those facts.

16  If those are the facts that a judge -- a bankruptcy judge has

17  in front of her, should she grant a motion to designate based

18  on the failure to purchase all but a small percentage of the

19  voting shares and then using that vote to defeat the plan?  Is

20  that bad faith?

21          MR. PAHL:  If we're in a situation, as we are in this

22  case, where unsecured creditors will be paid in full fairly

23  promptly under the bankruptcy plan proposed by the debtor, and

24  a creditor such as the bank here purchases a small percentage

25  of the claims, and I believe that the bankruptcy court believed

1  that there was significant risk that the failure of the plan

2  would result in either no or very minimal recovery by unsecured

3  creditors, that results in an unfair advantage, and I do think

4  that's a ground for a bad faith finding.

5  THE COURT:  All right.  Is that true regardless of

6  the reason why the lender takes that action?  You're adding

7  another fact, and I appreciate you adding it because it is

8  important in our case, and that is that not just purchasing the

9  minimum number of shares and voting them to defeat the plan,

10  and that minimum number ends up being a relatively small

11  percentage.  It's not like the number required to purchase and

12  defeat is 75 percent of the unsecured creditors.  It's a small

13  percentage.  But on top of that, if the plan at issue being

14  voted on is one that, you know, you don't see every day in

15  bankruptcy court, which would pay all the unsecured creditors,

16  if you have that, do you care whether the lender did what it

17  did on that set of facts, adding in your additional

18  consideration, in order to increase its own ability to recover

19  100 percent versus having really no impact on its ability to

20  recover 100 percent?

21  MR. PAHL:  I do think that gives you grounds for a

22  lack of good faith finding, which is what the court --

23  THE COURT:  What I'm asking is do you feel that even

24  if the lender can be said to have taken that action in order to

25  improve its financial position with regard to the plan?

1         MR. PAHL: In order to improve its financial position

2 over and above what it's claiming in the case or just simply

3 improving in its interest as a creditor?

4         THE COURT: I'm asking the latter, I think. I want

5 to clarify and say that it's attempting to defeat the plan out

6 of a -- out of a -- let's call it a numerically legitimate

7 position that defeating the plan improves its ability to

8 collect on its debt in bankruptcy court.

9         MR. PAHL: Yes. And I think --

10         THE COURT: Even if that's its motive, you'd still

11 claim that it's bad faith to do what a lender like that does?

12         MR. PAHL: I think that's the first step of the

13 analysis is to determine if there's some ulterior motive. If

14 there is, then you have a problem.

15         If there isn't an outside ulterior motive --

16         THE COURT: They just want to improve their position.

17         MR. PAHL: They just want to improve their position,

18 they're being an aggressive creditor and they're to pull any

19 procedural lever that they can in order to protect that

20 provision -- or that position, I think there's some other

21 playground rules that apply here, and I think that's where the

22 bankruptcy judge went. She determined that even acting to

23 protect your claim, it's improper to do so if it would visit a

24 harm on the creditors who did not get an offer. And in this

25 case --

1          THE COURT:  Isn't that principle one that's belied by

2     cases on bad faith, talking about what it takes to have bad

3     faith?  In other words, isn't there a fairly strong case

4     supporting the idea of just attempting to improve your position

5     in bankruptcy court, I guess I'd say, cannot be bad faith if

6     that's all you have?

7          MR. PAHL:  Okay.  I think that the cases -- and we

8     can look at the *Figter* case, the language directly on that

9     question, that the court was comforted by the fact that the

10    creditor in this case offered everyone the same terms and did

11    not take a position that was harmful to other unsecured

12    creditors.  The same with *Pleasant Hill*.  You have the same

13    kind of care being taken, and it's important to remember that a

14    bankruptcy court is a court of equity.

15         THE COURT:  And you think that *Pleasant Hill* and

16    *Figter* are stating the same standard of what is or isn't bad

17    faith?

18         MR. PAHL:  I think *Pleasant Hill* may be a little more

19    expansive in certain ways.  It talks about different --

20    different models of determining good faith.  *Young v. Higbee* is

21    sort of an early case, and I think it's *PR Holdings*, different

22    philosophies about how you get to a good faith or bad faith

23    conclusion.

24         THE COURT:  Well, what your opponent has cited -- and

25    there's a series of quotes, some out of *Figter* itself, for

example -- for the idea that as long as a creditor acts to
preserve what he reasonably perceives as his fair share of the
debtor's estate, bad faith will not be attributed to his
purchase of claims to control a class vote.

MR. PAHL: That's a very strong part of the *Figter*
case or the *Lenders* case, but the court goes on to talk about
the fact that this is a -- not a single-factor test, that it's
left to the discretion of the bankruptcy court to view things
based on the bankruptcy court's experience.

THE COURT: Well, I've never said to you any
hypothetical or description of what the bankruptcy court did
that is single factor or simple. I mean, I think we all agree
that a number of factors would need to be taken into account
here.

But what I'm asking is whether you think that at the
end of the day you need to show something beyond a lender
seeking to improve or protect its position in bankruptcy court
itself, as opposed to in some other way.

MR. PAHL: Well, I think the Court is on to something
with the fact that this likely results in a foreclosure and
that we have an oversecured creditor.

THE COURT: Well, let's start there, then, or go
there, then. Let's assume that something else is, in fact,
required, just for the moment. What is your view on whether
the actions taken by the lender here in some ways, according to

1  the bankruptcy court, seem almost superfluous to its legitimate

2  financial interest in the bankruptcy proceeding?  It's

3  oversecured and that it didn't need to ruin the plan in order

4  to protect its position, it took steps that hurt other people

5  without any real -- the subtext I'm getting from the bankruptcy

6  judge is it ruined those chances of unsecured creditors getting

7  paid without any real significant advancement of its own

8  interests.  Is that is what you see happening here?

9        MR. PAHL:  Well, it was a tradeoff, I think, for the

10  lender, and they made that determination.  Lenders do that all

11  the time.  The determination was we don't want to be paid back

12  over a long period of time, as you're proposing in the plan, so

13  we're going to fight that and we're going to fight you on the

14  interest rate.

15        So it's --

16        THE COURT:  We don't want to be paid back over a long

17  period of time.  Instead, we want what?

18        MR. PAHL:  We want our remedies now or --

19        THE COURT:  What remedies now?

20        MR. PAHL:  Dismissal of the bankruptcy case if the

21  plan can't be confirmed, conversion of the bankruptcy case to

22  Chapter 7.

23        THE COURT:  And foreclosure?

24        MR. PAHL:  Well, either it stays in Chapter 7, if the

25  Chapter 7 trustee wants to keep it and sees a benefit to

managing the case.  It seems to me unlikely that would occur,

and I think we end up outside of a Chapter -- of a bankruptcy

process, either Chapter 7 or Chapter 11.  It's possible,

though.  Those are possibilities.

THE COURT:  So in your view, the motive behind the

lender's actions here was to seek a faster payoff of roughly

the same amount of debt?

MR. PAHL:  And then while being fully secured, amply

secured on that payment, correct.

THE COURT:  Either way, it gets paid 100 percent, it

just gets paid quicker and more simply perhaps --

MR. PAHL:  Correct.

THE COURT:  -- if the plan isn't approved?

MR. PAHL:  Yes.

THE COURT:  All right.  Thank you.

I'd like to sort of start at the end.

MS. PEARSON:  Sure.

THE COURT:  The premise that we've been discussing so

far is that -- is that you were, in fact -- your client was, in

fact, oversecured and was going to get paid the amount of the

debt whether the plan was approved or not.  Is that premise

accurate?

MS. PEARSON:  I think generally that's correct, Your

Honor, but it's not the same thing to get paid in full today as

it is to be paid in full a year from now, and it's not the same

thing to be paid in full today as it is to take additional risk over time.

And *Figter* recognized that. If you look at the facts of *Figter*, what the secured lender in that case was concerned about was that its lien situation would become more complex; that instead of having a building where all of its units would be its collateral, it would be forced to take on collateral changes, where some of the units would be sold and some of the units would be rented, and it would have a building where only part of the building was its collateral, which is a much more complex and difficult asset for a lender to deal with.

THE COURT: Well, wouldn't that be true of almost every bankruptcy plan, that some lender's position becomes both more complex and perhaps drawn out over a slightly longer period of time than just quick payment?

MS. PEARSON: It's true that most bankruptcy plans do provide for the secured lender's position to become more complex in some way, but the bankruptcy code also recognizes, and I think case law also recognizes that it's entirely within a secured lender's prerogative to either agree with those changes and consent to them or to oppose them in its enlightened self-interest as a creditor. So, for example, in *Figter*, the Ninth Circuit said it was perfectly acceptable for the secured lender in that case not to want to have a more complex lien situation.

1          In this case, as you may recall from the record,

2   there was a fight over the interest rate.  There's a difference

3   between being paid at a low interest rate over time and being

4   paid at a high interest rate over time.  You can understand how

5   it would be in the bank's economic self-interest to have an

6   interest rate that it thinks is an appropriate recognition of

7   its risk in lending money, and --

8          THE COURT:  Wouldn't it be the case that there's a

9   difference between being paid a low interest rate versus a high

10  interest rate but that that difference starts to diminish or

11  disappear if your choices are two:  one, a low interest rate

12  over a long period of time versus a high interest rate over a

13  short period of time?

14         MS. PEARSON:  But in this case there were facts that

15  made payment over a long period of time more difficult for the

16  lender, and that was specifically --

17         THE COURT:  First I'd like you to answer my question.

18  It wasn't rhetorical.  I want to make sure I'm tracking you,

19  so --

20         MS. PEARSON:  Okay.

21         THE COURT:  -- is that correct that you're facing

22  basically two options:  a low interest rate over a lengthier

23  period of time -- let's call it a year -- versus a higher

24  interest rate in which you see things brought to payment much

25  more rapidly than a year?  Are those the two choices you faced

1   with regards to interest rates?

2        MS. PEARSON:  No.  The choices over interest rates

3   were that each party had argued that a different interest rate

4   appropriately recognized the risk that applied in this case for

5   payment.  The secured lender thought that the risk was higher

6   and a higher interest rate was appropriate.  The debtor thought

7   that a low interest rate -- that this was a less risky

8   proposition and proposed a lower interest rate.  It wasn't

9   necessarily a choice between low rate over short period of

10   time/high rate over long period of time.

11        THE COURT:  That isn't what I said.

12        MS. PEARSON:  Okay.  I didn't understand your

13   question.

14        THE COURT:  I understand how the idea of the lower

15   interest rate came up, and I understand why your client

16   wouldn't like to have its interest rate reduced, and I further

17   understand how that can be a part of what you called

18   enlightened financial self-interest here.

19        What I'm getting at is the plan that would have

20   shoved a lower interest rate down your client's throat would

21   have paid that lower interest rate, made payments on the debt

22   over -- also over a longer period of time than your other

23   choice, which was to defeat the plan and take whatever steps

24   you wanted to take to get collection on your debt at the

25   agreed-upon higher interest rate.

1    Weren't those your two options:  defeat the plan and

2  get paid faster than the plan contemplated, or agree to the

3  plan and get paid over a longer period of time at a lower

4  interest rate?  Were those your two choices?

5    MS. PEARSON:  No.  Because I think there's an

6  assumption baked into that that if this plan were not confirmed

7  that no other acceptable plan could ever have been proposed.

8    In this situation, if the plan were not confirmed,

9  the only outcome of that is that the plan was not confirmed.

10  The debtor would be free to propose a plan that we would have

11  thought was acceptable.  That wouldn't necessarily have

12  involved foreclosure, that would not necessarily have involved

13  a Chapter 7 plan.  It may simply have been that the debtor

14  would have proposed payment terms that the creditor would have

15  liked better.

16    We don't know what would have happened, so we can't

17  say with certainty it was choice A, the plan; or choice B, we

18  stick with our contract interest rate and we get to go

19  foreclose, because those weren't the choices.

20    The choice the bankruptcy judge was making was --

21    THE COURT:  Well, as between them, as between those

22  two choices, without the addition of the new proposed plan,

23  doesn't the idea that what you're seeking, among other things,

24  is higher interest rate start to matter less just by

25  comparison?  That is, that you're just going to get paid.  The

1    gap between the amount of interest you collect on the debt is

2    going to be smaller than if the payment period, high interest

3    versus low interest, were the same.  That's fairly obvious,

4    isn't it?  If you get paid a high amount of interest for three

5    months versus a low amount of interest for 12 months, the

6    amount you collect in interest is going to be closer than if

7    both of the options I just gave you are for payment over 12

8    months.

9            MS. PEARSON:  If both of those things were to happen

10   with certainty, and the math worked out right, I think I would

11   agree with you.  But we had some other factors here, and one of

12   the other factors that was very important in trial was that

13   there was tenants in this property whose lease was going to

14   expire, and there was a real question about whether or not that

15   tenant was going to reup on its lease.  And that lease was the

16   source of payment over time.  So the lender had legitimate

17   concerns that a plan that proposed to pay it over a long period

18   of time, where there was no certainty that the lease would be

19   renewed, was a riskier plan to the lender, not mathematically,

20   in terms of whether short period of interest -- low interest in

21   a short period of time, high interest over a long period of

22   time, but going to the factor of whether those payments were

23   ever going to actually be completely made by the time you got

24   to the end of the longer period of time at all.

25           THE COURT:  And that's independent of the value of

1    the property itself, or is that built into the value of the

2    property itself?  When I'm told that your client was

3    oversecured, were you oversecured based just on the sale value

4    of the property itself or is somehow the value of the property

5    including the idea that it has a high-bidding tenant?

6         MS. PEARSON:  I think that the tenant in place paying

7    rent is a significant function of the value of the property.

8    An empty building is not worth as much as a building with a

9    regularly paying tenant, all other things being equal, two

10   buildings in the same place, and they're constructed

11   identically, they're the same size, the same shape, the same

12   color --

13        THE COURT:  I understand that.  As an abstract

14   matter, I completely agree.  What I'm asking is on this record,

15   on these facts, in terms of the actual security in place here,

16   can you say that you were, in fact, concerned that your

17   position of being oversecured was at risk by the departure of

18   the tenant?

19        MS. PEARSON:  I think the bank did believe it -- the

20   lender did believe it had that risk.

21        THE COURT:  And do you know if that was expressed to

22   the bankruptcy judge ever on this record or not?

23        MS. PEARSON:  There was testimony on record about the

24   concern about the tenant not remaining in place, and I believe

25   it also factored into the interest rate discussion, because I

believe that was one of the reasons that the secured lender
thought that the higher rate was appropriate to reflect that
risk.

THE COURT:  All right.  So far you've told me a
couple things that you contend were within your client's
enlightened self-interest here.  One was not to lose out on a
higher interest rate, and the second was not to lose out
on a -- well, the second was the risk of losing out at the
upcoming expiration of a lease of a paying tenant.  And what
follows from that is the possibility that it even goes as much
as not just affecting cash flow but your secured position with
regard to the property.  Right?

MS. PEARSON:  I believe that's correct.

THE COURT:  At least reduces it, if not --

MS. PEARSON:  Reduces it.  I don't know that I can
say eliminate.

THE COURT:  Do you know if it reduces it to a point
where you're no longer what we would call oversecured or not?

MS. PEARSON:  I don't know, Your Honor.

THE COURT:  All right.  Anything else that you want
to contend was part of your client's legitimate financial
interest in defeating the plan?

MS. PEARSON:  The lender did not like the proposed
payment terms, payment over such an additional period of time.
There was a concern that with the duration of the plan being

1    contingent upon the risk of the tenant leaving, that the bank's

2    position would be at risk. Cash was very important to the

3    bank. Banks are not generally interested in repossessing

4    property. They would rather have the payment.

5         We know from the record that the debtor did discovery

6    and tried to find some other interest that the bank might have

7    and was unable to find that, unable to put any evidence on the

8    record about that.

9         THE COURT: Is it your position that so long as the

10   bank didn't have some interest in play that it was seeking to

11   advance outside the context of the money and property

12   associated with the plan itself, that it couldn't have been

13   acting in bad faith? In other words, it can do pretty much

14   whatever it wants, as long as it's doing something to advance

15   its interest in bankruptcy as opposed to, you know, a personal

16   beef against one of the borrowers or some other business

17   interest it's trying to advance by anticompetitive behavior.

18   As long as that's not what's in play, nothing else is bad

19   faith?

20        MS. PEARSON: I think that you have to have that

21   ulterior motive, that competitive advantage you're seeking, or

22   you have to have outside malice towards the debtor, or you have

23   the goal of driving someone else out of business for your

24   competitive purposes, or an effort to try to maintain control

25   of the debtor, or some ulterior motive you can point to that's

1  in addition to the lender trying to protect its own claims.  If

2  you don't have that additional ulterior motive under *Figter*,

3  it's our view that you do not have bad faith.

4       THE COURT:  So you'd give a different answer than

5  Mr. Pahl to the hypothetical that says if what you have is a

6  lender who buys a small amount of the number of shares, just

7  the amount necessary to have enough votes, leaves a large

8  percentage of the unsecured creditors outside of the circle of

9  purchased shares, and does so in a setting where -- somewhat

10 unusual -- the plan itself would likely result in nearly

11 complete payment to nearly all the unsecured creditors, and

12 defeat of the plan means that's unlikely to happen, if you have

13 all of those facts but the bank is, let's say, concerned about

14 the departure of a tenant and anything else that advances its

15 financial interest, that cannot be bad faith, in your view?

16      MS. PEARSON:  I do believe that, and I think that

17 comes --

18      THE COURT:  Do you feel that the judge here applied

19 the wrong standard then or just got the facts wrong?

20      MS. PEARSON:  I think the judge applied the wrong

21 standard because I don't think any of the facts were in

22 dispute.  The facts were that the lenders bought 11 of the

23 claims.  There were three claims that the lenders didn't buy

24 from two creditors, one of them because it was over budget and

25 there was a concern that that claim had had a close

1 relationship with the debtor.

2        THE COURT:  Sure.  I'm familiar with those sale

3 facts.

4        Was the judge aware of the financial interest facts

5 that we've just discussed with regard to interest rate and the

6 tenant?

7        MS. PEARSON:  Yes, Your Honor.  There was an entire

8 hearing on the interest rate issues that happened in June.

9        THE COURT:  So all the facts were before the judge,

10 and you believe she had the facts correctly present before her

11 and applied the wrong legal standard?

12        MS. PEARSON:  I think that there is no evidence that

13 the lenders in this case had an ulterior motive.

14        THE COURT:  Let me ask it a different way, then.  Do

15 you think that *Pleasant Hill Partners* posits a different

16 standard than *Figter*?

17        MS. PEARSON:  I do.

18        THE COURT:  And do you think that's the standard the

19 judge applied here or not?

20        MS. PEARSON:  I do think the judge applied the

21 *Pleasant Hill* standard here.

22        THE COURT:  So to come back to my original question,

23 do you think the judge applied the wrong legal standard to the

24 correct facts?

25        MS. PEARSON:  I do, because what *Figter* says -- and

1  this is straight from *Figter*:  "It is always necessary to keep

2  in mind the difference between a creditor's self-interest as a

3  creditor and a motive which is ulterior to the purpose of

4  protecting the creditor's interest."

5  In other words, there are two boxes:  there is the

6  creditor protecting the creditor's own interest, which the

7  creditor is allowed to do and the creditor should have

8  significant latitude to do; and the second box, which is the

9  creditor acting from an ulterior motive, something that's

10  improper and exterior to the case, like a competitive motive or

11  malice or an effort to take control of the debtor for its own

12  business purposes.

13  THE COURT:  All right.  With that in mind, I assume

14  you would assert that the standard of review that I apply to

15  what happened in the bankruptcy court is different; that is,

16  the judge had the correct facts and I don't need to worry about

17  finding clear error.  Instead, I apply a less deferential

18  standard of review as to whether the judge got the legal

19  standard right.  Is that your position?

20  MS. PEARSON:  I think we have to go back to the

21  standard of review that's in *Figter*, because we do recognize

22  that it's binding authority.  And I think it starts out with

23  the first concept that you're talking about, which is to the

24  extent that --

25  THE COURT:  I don't want you to go where I started

1    out.  I want you to go to where I ended up.

2        Do you agree that I would apply an essentially de

3    novo standard of review to the judge's decision about what

4    legal standard to apply to the otherwise relatively agreed-upon

5    facts or not?

6        MS. PEARSON:  Yes.  It's a de novo review of the

7    legal standard.  It's clear error review of the facts.

8        THE COURT:  All right.  Then finally, where in the

9    record can you point me to to discern -- to learn what

10   standard, what legal standard the judge applied to the facts?

11       MS. PEARSON:  Your Honor, in the ruling that the

12   judge cited to *Pleasant Hill*, and specifically cited to the

13   position that the Court should consider the impact on other

14   creditors -- and I will point you to that in the ruling.  And

15   that is in the excerpt of record from pages 469 to 473 in the

16   course of her ruling, and I've quoted it on page 19 of our

17   brief.

18       "Good faith does not require a creditor to act with

19   selfless disinterest.  And the fact that a creditor purchases

20   claims to take a blocking position is not, per se, bad faith

21   under 1129 - 1126(e).  However, a creditor's conduct in

22   furtherance of its own interest should not result in an unfair

23   disadvantage to other creditors.  *In re Pleasant Hill Partners*,

24   *LE*," and goes on to give the cite.

25       THE COURT:  And your view is that is simply an

1 | incorrect statement of the law, right?

2 | MS. PEARSON: That is correct.

3 | THE COURT: Thank you. Did I miss anything regarding

4 | that?

5 | MS. PEARSON: Not at this point, Your Honor.

6 | THE COURT: And I guess if you win on designation on

7 | reclassifying, you simply rely on your brief for the argument

8 | that you can't use a dragnet clause like this for debts

9 | acquired after bankruptcy is filed, right?

10 | MS. PEARSON: That is correct. And the Fifth Circuit

11 | has spoken on that, both before and after the bankruptcy code

12 | was adopted. I think the rule stated, and the Fifth Circuit is

13 | correct, which is that the nature of the claim is based on what

14 | it was at the time that the case was filed. Otherwise, an

15 | oversecured lender would simply go out and check favorable

16 | terms, could go out and buy a bunch of unsecured claims and

17 | turn them into secured claims.

18 | THE COURT: All right. Thank you.

19 | MS. PEARSON: And that would defeat the purpose of

20 | the bankruptcy code.

21 | THE COURT: Thank you.

22 | Mr. Pahl, I really just have two questions. One is

23 | Ms. Pearson suggests that really the facts that you all argue

24 | were all present before the bankruptcy judge; she didn't miss

25 | any of the important facts we're discussing today.

1    MR. PAHL:  And I guess I would supplement a little

2  bit.  We're not here to talk about the interest rate issue, but

3  the judge did take testimony from the debtor's expert, as well

4  as the lender's expert, and applied the controlling authority

5  at least in this district, the U.S. Supreme Court case of *Till*,

6  which basically sets a prime plus risk factor.

7    THE COURT:  I'm not so much concerned about that as

8  to just whether -- so today appellant advances fundamentally

9  two reasons -- there are sort of sub-reasons that flow from

10  that, but two reasons why the lender was acting in its own

11  legitimate financial self-interest in what it did.  One is that

12  it legitimately sought to defeat imposition of a lower interest

13  rate, and two is that it had concerns about the upcoming

14  possible loss of a tenant as it related to both cash flow and

15  security.

16    So just as to whether those facts were before the

17  bankruptcy court, do you agree?

18    MR. PAHL:  I do agree, although there wasn't -- the

19  existing loan with the lender, between the lender and the

20  debtor had expired.  So -- and the interest rate approved by

21  the bankruptcy court, as well as the interest rate proposed by

22  the debtor, I believe, was equivalent to the existing loan rate

23  on the expired loan.  And the loan interest rate approved by

24  the bankruptcy court was a point and a quarter higher.

25    THE COURT:  All right.

1          MR. PAHL:  So there wasn't an option for higher

2    interest rate except on a different evidentiary finding by the

3    court.

4          THE COURT:  And then on that same point, Ms. Pearson

5    has told me that she can't be certain whether the possible loss

6    of the tenant would have affected not just cash flow but the

7    lender's position of being fundamentally oversecured or not.

8          Do you know if it would have dropped the value

9    significantly enough to result in the lender being less than

10   fully secured?

11         MR. PAHL:  I don't think we have facts about that.

12         THE COURT:  It seems like it's too speculative to

13   know.

14         MR. PAHL:  It's speculative.  And the court heard

15   evidence about the likelihood of the tenant renewing and

16   renewing a second option to renew.

17         THE COURT:  All right.  So we have fundamentally

18   agreed-upon facts, and so the core of your opponent's

19   argument -- or really the whole thing is that the judge applied

20   the wrong legal standard.

21         MR. PAHL:  I understand that.

22         THE COURT:  Because if it's legitimate -- I'm going

23   to turn to page 19 of your opponent's brief again.

24         (Loudspeaker announcement.)

25         MS. PEARSON:  It got our attention.

1          THE COURT:  If it's legitimate expression, to quote

2     from *Pleasant Hill Partners*, to take into account whether the

3     creditor's conduct results in an unfair advantage or

4     disadvantage to the other creditors, then I guess my view would

5     be that if that's the correct legal standard on these facts,

6     then the judge is entitled to clear error review, and I would

7     not find clear error.

8          So your core argument against you is that that's

9     actually an incorrect statement of the legal standard and that

10    it's stricter under *Figter*.  What's your response to that?

11         MR. PAHL:  Well, I don't believe that the Ninth

12    Circuit in *Figter* would have talked about the fact that the

13    lender in *Figter* had offered the same terms to every creditor,

14    and the actions of the lender in purchasing the claims would

15    not result in an unfair advantage or prejudice to the -- to

16    unsecured creditors, even though it may.  And I think that's

17    part of the *Figter* decision.  I'm not sure why the Court would

18    go through that discussion when it actually gets to the point

19    in the case where it's applying the test.  It's reviewing

20    exactly what the bankruptcy court below had done.

21         And the second factor it lists -- it discussed was

22    the equality, the equity in how the lender believed Teachers or

23    TIAA approached its acquisition of claims.  And I think it read

24    a lot into that.  That's good faith.  Is the opposite of that

25    bad faith?

1    I think you back up a couple paragraphs in *Figter* and
2 you look at the fact that this is a really fluid concept and
3 it's based heavily on the experience and knowledge, the
4 presence of the bankruptcy court when the evidence is coming
5 in.

6    THE COURT:  I have *Figter* in front of me, so when I
7 back up a couple paragraphs, where am I?

8    MR. PAHL:  Sorry.  Let me go to *Figter*.  I'm looking
9 at the paragraph that starts with the word "Here."

10    "Here the bankruptcy court did exactly that."

11    THE COURT:  Give me a little bit more to go on to
12 find where you are.

13    MR. PAHL:  I'm sorry.

14    THE COURT:  The discussion sub A, good faith, where
15 are you in relation to that?

16    MS. PEARSON:  It's in subparagraph A right before --
17 two paragraphs before subparagraph B, Your Honor, the top of
18 page 640.

19    THE COURT:  Thank you.  I'm there.

20    MR. PAHL:  Good.  So actually the prior paragraph is,
21 "In short, the concept of good faith is a fluid one, and no
22 single factor can be said to inexorably demand an ultimate
23 result, nor must a single set of factors be considered," going
24 through and basically talking about the importance of the
25 judgment of the bankruptcy court in assessing this.

1    And then it talks about, "Here, the bankruptcy court
2  did exactly that."  And it talks about nor did Teachers seek to
3  purchase a small number of claims for the purpose of blocking
4  Figter's plan while injuring other creditors, even though it
5  could do that in some circumstances.  "Rather, Teachers offered
6  to purchase all Class 3 claims, and only some of those
7  claimants' refusals to sell precluded it from doing so," so a
8  discussion that does not match with a bright-line ulterior
9  motive standard of -- legal standard.
10    So I think the court looking at this, looking at the
11  *Pleasant Hill* case, came to view the ulterior motive standard
12  as not just a bright line but as one aspect of determining good
13  faith.
14    On the question of whether this is a legal standard
15  of review, a mixed question of law and fact, and what the
16  standard of review should be, the *Figter* court went through
17  that in detail as well and recognized that part of a good faith
18  determination are questions of law to be reviewed on appeal
19  de novo, and some are questions of fact.  And often it's a
20  mixed question of law and fact that the Court was very clear in
21  the instruction that it is to be reviewed for clear error.
22    THE COURT:  What is to be reviewed for clear error?
23    MR. PAHL:  The good faith determination.
24    THE COURT:  Does that include separating out the
25  legal standard?  You contend that if the legal standard is the

1  real issue in play, that I should review whether it was the

2  correct legal standard for clear error?

3          MR. PAHL:  Well, I think the judge did apply the

4  correct legal standard.

5          THE COURT:  I know that.  Otherwise, you wouldn't be

6  here.

7          MR. PAHL:  Right.

8          THE COURT:  But if she didn't, then do I apply that

9  decision, the standard of review of clear error?

10         MR. PAHL:  If the Court is of the view that the

11 bankruptcy court applied the wrong legal standard, I do think

12 that's a de novo issue.

13         THE COURT:  Do you believe that defining what in the

14 abstract does or does not constitute bad faith or ulterior

15 motive is a question of law?

16         MR. PAHL:  I think it's a mixed question of law and

17 fact.

18         THE COURT:  What are the facts that are mixed into

19 that question?

20         MR. PAHL:  I think the circumstances in the case, in

21 particular, were very influential to the court, the fact

22 that --

23         THE COURT:  The facts of the case are always

24 influential when one applies a legal test.  That's the next

25 thing is you figure out what the legal test is and then you

apply it to the facts.  But isn't there at some point even in a case like this a predicate legal test that has to be applied?

MR. PAHL:  I do think there is one.  And, again, that's a basic good faith test, and if the court got it horribly wrong --

THE COURT:  Why do you have to get it horribly wrong? Why can't you just get the legal test wrong?

MR. PAHL:  Well, I do think it's difficult here because it is essentially a mixed question of law and fact. There are legal standards that apply, but those come to life as you apply the facts to them, and given the mixed nature of it, I think the *Figter* court was clear in saying in this general area, we're going to apply clear error standard because the facts are so intertwined with the application of the legal standard.

THE COURT:  Thank you.

I'll take a brief break and come back.

THE CLERK:  This court is in recess.

(A recess is then taken.)

THE COURT:  Thank you for your patience in waiting. I'm going to do three things.  I'm going to tell you the answers so there's no confusion about it, and I'm going to explain my answer in two parts, and there will not be a written opinion following this.

First I'm going to explain what I think is -- what

1  I'd call the pristine analysis of this case, the analysis that

2  most closely tracks the sort of a typical application of a

3  legal standard, factual findings and the application of facts

4  to those findings.  I'm going to say that if that's what

5  happened, if that were, in fact, the correct way to approach a

6  case like this, then I would find that the judge here applied

7  the wrong legal standard and relied or emphasized what should

8  be viewed as irrelevant facts and committed error.

9        But what I'm going to say at the end then is that in

10  my reading of *Figter* and the standard of review suggests that

11  these cases present an unusual situation, where that sort of

12  pristine, clear-cut analysis of abstract legal standard factual

13  findings and applying the facts to the standard isn't the

14  correct way to approach these kind of cases per the Ninth

15  Circuit in *Figter*.  And that has persuaded me that I need to

16  take a more -- almost gestalt-ish approach to this case and

17  apply only the clear error standard to the overall reasoning of

18  the judge and affirm.

19        So, first, as I said, the result here is that I do

20  not find it was error in granting the motion to designate, and

21  therefore I will affirm.  That requires me not to have to reach

22  the second issue briefed by the parties and only briefly

23  discussed here today.

24        Here's what I think would be the normal way to look

25  at this case.  You'd say that there is a definition out there

of what is bad faith, and that it -- once you're done applying
a lot of things that fold into that analysis, you do, I think,
eventually get to the point where so long as a lender is acting
in pursuit of its legitimate financial interests in the
bankruptcy proceedings, the consequences on other creditors
becomes irrelevant, and that is sort of how we start out
looking at bad faith.  We look at -- a lot of other things
could matter, but they only really start to matter when the
creditor -- the lender here is seeking something beyond its
legitimate financial interests in the bankruptcy proceeding.

And I would say that the application of outside
circuit law, particularly *Pleasant Hill Partners*, represents a
slight, at least, deviation from that abstract test that one
would apply across all these cases.

And I further say that the lender here, both today
and in bankruptcy court, posited legitimate financial interests
that it was entitled to seek to preserve or advance in the
bankruptcy proceeding, specifically rejecting a lower interest
rate, preserving an important cash flow, and preserving the
impact of that cash flow on the security position it had in the
property.

And so here, the bankruptcy court clearly placed
heavy reliance on the impact that defeating the plan -- buying
the votes and defeating the plan would have on the unsecured
creditors, and probably did so because of a pretty unusual

fact -- not unheard of, but a pretty unusual fact, which is
that she saw this as a risk of the case going from complete
100 percent payment to unsecured creditors to potentially many
unsecured creditors getting nothing.

However, in *Figter*, the Ninth Circuit was clear to
explain that this sort of classical and pristine view of the
three-part analysis -- figure out what the abstract test is,
figure out what the facts are, apply the facts to the test --
isn't really what's going on in these sorts of cases, and
that's why it makes clear to district courts that they ought to
keep in mind that whether someone acted in good faith is
essentially a factual inquiry that is driven by, quote, the
data of practical human experience, close quote.  It's
ultimately reviewed for clear error.

So, in my view here, what I take from that is that
this abstract definition is not intended to set hard -- a hard
perimeter around the bad faith definition, but it's subject to
further analysis by the bankruptcy courts and the data of human
experience that they take a harder look at that themselves as
cases develop, and that I shouldn't be using the de novo legal
review standard here to strictly enforce an abstract legal
definition of bad faith when the inquiry is such a practical
one.

Further, that here the bankruptcy judge did have an
unusual fact to take into account not found in the existing

precedent, this idea of nearly full payment, and that in the mix of things, taking that fact into account, taking into account a somewhat flexible definition of what bad faith is or isn't, reading the language in *Figter* that at least defines good faith in terms of taking care of competing creditors to some degree in purchasing shares, all of that mixed into a whole, I don't find to be clear error.

I'll say candidly that I'm not fond of the analysis set out, in my view, in *Figter*. I think it upends the longstanding understanding of what de novo review means when it's applied to the abstract legal definition, but I can't figure out how to apply *Figter* the way I would apply it without essentially overruling it, which, of course, I'm not at liberty to do. Therefore, I affirm the decision of the bankruptcy judge below.

Thank you all. We'll be in recess.

MS. PEARSON: Thank you.

THE CLERK: This court is adjourned.

(Proceedings concluded.)

--o0o--

I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


/s/Bonita J. Shumway                    5/5/2016
_____               _____
BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
Official Court Reporter